2005 D.S.D. 3

UNITED STATES of America,
Plaintiff,

v.

BRANDON IN THE WOODS,
Defendant.

No. CR 04–30057.

United States District Court,
D. South Dakota,
Central Division.

Jan. 28, 2005.

Jay P. Miller, U.S. Attorney's Office, Pierre, SD, for Plaintiff.

Edward G. Albright, Federal Public Defender's Office, Pierre, SD, for Defendant.

## AMENDED MEMORANDUM DECISION AND ORDER

KORNMANN, District Judge.

[¶ 1.] Defendant filed a motion for suppression and a supporting brief (Docs. 33 and 34), dealing with a statement made by the defendant after he had been taken to the tribal police department and a knife found in the defendant's pocket. U.S. Magistrate Judge Moreno conducted an evidentiary hearing on November 16, 2004, and filed and served a report and recommendation for disposition of the motion (Doc. 45). The Court has conducted a *de novo* review of the transcript of the hearing (Doc. 44), the transcript of the findings made on the record by the magistrate (Doc. 46), and all the files and records herein. Defendant has filed objections (Doc. 52) to the recommendation of the magistrate and the objections have been considered.

## BACKGROUND

[¶ 2.] On August 26, 2004, a superceding indictment was filed charging the defendant with two counts of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 1153 and 113(a)(3). The indictment alleges that the defendant threatened Merrill Condon ("Merrill") and Bernice Condon ("Bernice") with a knife on February 21, 2004, in Dewey County, South Dakota.

[¶ 3.] At approximately 11:28 a.m. on February 21, 2004, Tammy Hale ("Hale") called the Cheyenne River Sioux Tribe police department and reported that a man had walked into house #476 at "Chinatown Housing" with a knife. Hale stated that the man was waving the knife all over the place. Hale did not describe the knife with any details. Hale did not state who the male was or if she knew him and did not give a further description of the male. The dispatcher who took the call reported hearing a male's voice in the background stating that he was going to kill someone.

[¶ 4.] Cheyenne River Sioux Tribe officers Jeremy Webb ("Webb") and Halley Maynard ("Maynard") arrived in the Chinatown Housing area at 11:33 a.m. At this point, they had no name or description to work with, other than the fact that the person at the Hale residence was a male. Maynard observed the defendant walking down the street toward the police unit approximately 30 or 40 yards away from house #476. Maynard did not see the defendant walking out of house #476 or even the lot itself. Maynard also noticed that the defendant was carrying an object

in his right hand which he put in his right front pocket. Maynard testified that he did not know what the object was that the defendant stuck in his pocket and none of his observations up to that point led him to believe that the defendant was in possession of a weapon.

[¶ 5.] Officers Webb and Maynard then pulled up to the defendant, stepped out of the vehicle, asked the defendant to place his hands on his head, and handcuffed the defendant. Maynard testified that the defendant was not free to leave at that point. The officers then conducted a search of defendant. A three inch folding knife was found in defendant's right front pocket. Defendant was then placed in the police unit and transported.

[¶ 6.] Maynard then approached house # 476 and spoke with Bernice, who refused to sign a criminal complaint. Maynard then told Bernice that he would sign a complaint for her although he had no personal knowledge of any criminal activity. Defendant was placed under arrest for a tribal weapons offense. He was then taken to tribal jail. According to tribal officers Gunville and Turning Heart, defendant behaved in a disorderly fashion at the jail and stated that he was going to kill everyone when he got out of jail. While at the jail, defendant was served with a warrant and additional charges of disorderly conduct and elderly abuse were added.

### DISCUSSION

[¶ 7.] The Fourth Amendment guarantees "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ..." Under the Fourth Amendment's exclusionary rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of an illegal search and seizure. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

Defendant makes essentially two claims here. First, he contends that the investigatory stop on the street was an unreasonable search under the Fourth Amendment, thereby requiring the suppression of the knife subsequently seized from him and statements he later made to law enforcement. Second, he argues that his arrest violated the Fourth Amendment, as it was not supported by probable cause.

[¶ 8.] An investigatory, or Terry, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1, 25–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "When justifying a particular stop, police officers 'must be able to point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). A Terry stop may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force. *Id.* (citing *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). During a Terry stop, officers can check for weapons and may take additional steps reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop. *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

[¶ 9.] The government has a couple of problems with the claimed Terry stop that took place here. The first problem is the lack of specific facts that might warrant this particular intrusion. "The Supreme Court long ago made clear that it is appropriate for police to conduct an investigative stop 'when the victim of a street crime seeks immediate police aid and gives a description of [the] assailant.'"

*United States v. Fisher,* 364 F.3d 970 (8th Cir.2004) (quoting *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). We have no "street crime" involved here. There was no description of an assailant here. The only information provided was that there was a man with a knife who was waving it around in the house. Maynard testified that he saw a man on the street put something in his pocket. Maynard had no idea what the knife looked like, let alone what the man with the knife looked like. Without question, it would be at least somewhat unusual for an assailant to wield a three inch pocket knife as a weapon of choice in a knife attack. It would be presumptuous for an officer to surmise that an object small enough to be carried in a man's pocket was the weapon involved here. When one considers the threat of an imminent attack with a knife or a stabbing, an image of a pocket knife does not generally enter one's mind. Indeed, Maynard testified that he did not know what the defendant was putting in his pocket and, at the point he stopped to investigate, had not observed anything that led him to believe the man may have been carrying a weapon. These statements seemingly contradict any claim that reasonable suspicion existed. Essentially, what the officers were looking at when they stopped was nothing more than a man walking normally in the street who put something small in his pocket.

[¶ 10.] The second problem for the government is the fact that the two officers handcuffed the defendant immediately upon coming into contact with him. There is no claim that defendant consented to any seizure or search. The court has considered Eighth Circuit authority addressing the issue of the use of handcuffs during and in connection with Terry stops. There is certainly authority which suggests that the use of handcuffs does not necessarily result in a "seizure" of the defendant for Fourth Amendment purposes. *See e.g.*

*Navarrete–Barron,* 192 F.3d at 791 (limits of a Terry stop were not exceeded when the defendant was handcuffed and placed in a police car while the officers searched a truck), and *United States v. Miller,* 974 F.2d 953, 957 (8th Cir.1992) (reasonable for officers to handcuff suspects during a Terry stop for suspected drug activity when the officers were outnumbered by suspects).

[¶ 11.] However, other Eighth Circuit authority suggests that officers' use of handcuffs amounts to a seizure for Fourth Amendment purposes such that the officers' actions must be supported by probable cause. In *United States v. Tovar–Valdivia,* 193 F.3d 1025, 1027 (8th Cir. 1999), the defendant arrived in Kansas City, Missouri, from Los Angeles on a Greyhound bus. An officer with the Kansas City Police Department, assigned to interdiction duties at the bus station, witnessed the defendant exit the bus and leave the terminal. The officer's attention was drawn to the defendant because he had just come off the bus from Los Angeles, a source city for narcotics, and appeared to be in a hurry. The officer also testified that the defendant's "new bag" was indicative of possible narcotic trafficking. As the defendant talked with a cab driver, the officer approached the defendant, asked to see his bus ticket, and asked if he could search his bag. The search was conducted and no contraband was found. As the officer searched the bag, he noticed bulges under the defendant's shirt. The officer testified that he was concerned the bulges were weapons. He proceeded to feel the bulges and determined that they were not part of the defendant's anatomy. The officer then requested the presence of another officer and together they handcuffed the defendant, unbuttoned his shirt, and found narcotics strapped to his body. The defendant's motion to suppress was denied by the district court. The Eighth

Circuit vacated the defendant's conviction and sentence, reasoning as follows:

> We first consider whether the police seizure of Tovar amounted to an arrest. We have little trouble determining that the officer placed Tovar under arrest when he placed the handcuffs on him. At that moment, Tovar was restrained, and, by any reasonable standard was not free to leave.

*Id.* at 1027.

[¶ 12.] In a footnote, the court went on to note that the officer's actions were not justified as a Terry stop. Specifically, the court noted that Terry did not "authorize the police officers to handcuff and search an individual after the initial pat-down of the bulge did not confirm the existence of a weapon or contraband." *Id.* at 1028 n. 1.

[¶ 13.] In this case, the officers' "reasonable suspicion" as to this man walking normally on the street, as already discussed, was nil. Moreover, the officers did not conduct a pat-down search when they initially confronted the defendant. Instead, they immediately handcuffed the defendant and then proceeded with the intrusive search. Intuitively, when an officer restrains an individual with handcuffs, it is clear that the individual is not free to leave. It is hard to imagine any situation more tantamount to an actual arrest.

■■■ [¶ 14.] If officers do not have a reasonable articulable suspicion sufficient for the initial detention, a subsequent search will be held unconstitutional even though probable cause is later established. *United States v. Escobar*, 389 F.3d 781, 784 (8th Cir.2004). Regardless of whether the Terry stop in this instance exceeded permissible bounds, the court is not able to conclude that this defendant's later arrest was supported by probable cause. The officers involved in this investigation basically attempted to work backwards. "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *United States v. Rivera*, 370 F.3d 730, 733 (8th Cir.2004) (citing *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.1987)). Probable cause is evaluated "not from the perspective of an omniscient observer, but on the facts as they would have appeared to a reasonable person in the position of the arresting officer." *Id.*

[¶ 15.] There is no factual dispute as to what happened. Thus, there are no witness credibility issues. The police log shows what the dispatcher was told by the caller. There is no evidence other than inadmissible hearsay evidence about what the dispatcher told the two police officers and thus what they knew. At a minimum, however, we know what the officers did not know. They did not know the age, race, name, nickname, height, weight, clothing, hair color, eye color, or anything else about the alleged assailant other than that he was a man. The officers knew nothing about the man's voice, whether or not the man had been "waving" the knife in a threatening manner as distinguished from "all over" (whatever that means), how close he was to the occupants, who was in the house, whether the man had a vehicle or other means of transportation available to him, how long he had been in the house, and whether he was under the influence of any intoxicant. The police log shows that the caller told the dispatcher to "hurry, hurry." That would indicate some urgency to go to the house. The house would have been the only logical location for the alleged criminal activity. There was nothing to indicate that any criminal activity was taking place in the street perhaps up to 1/2 block from the residence. A reasonable officer would think that the alleged assailant was still in the residence, perhaps

engaged in an attack with the knife, rather than walking down the street some distance from the house. The police log shows that the dispatcher was told that the alleged assailant did not know that the police had been called. Thus, any reasonable person would think that the assailant, apparently intent on killing one or more residents, would still be in the residence, given that the police arrived five minutes after being called. A reasonable officer would have seen a duty to first investigate what was going on in the house and to prevent any further assaults, not stop a man walking on the street. A reasonable officer would have concluded that it was highly unlikely that the alleged assailant had left the residence in such a short period of time. The defendant made no attempt to flee from the officers.

[¶ 16.] Everything available to the officers would tell them that the man on the street had no connection with what was allegedly going on in the residence. If in fact this was an urgent call and need to head off a stabbing, reasonable officers would pay no attention to a man simply walking in the street away from the residence. The fact that he was the only male observed walking on the street is entirely immaterial. This is a sparsely populated area, not a metropolitan area with many people on the street at any given time. Assuming there had been two or three males walking in the street, would the police be permitted to stop all of them, handcuff them all, and arrest them? The officers here did everything backwards.

[¶ 17.] The dispatcher was not called to testify. The log indicates that she had the caller stay on the line while the two officers were answering the call. There is no evidence about what, if any, additional information, the caller was able to give. For example, there is no evidence that the caller advised the dispatcher or that the dispatcher advised the police officers that

the alleged assailant had in fact left the residence. Did the officers know that the caller was still on the line? Did they ask her to attempt to obtain further information? There is no evidence of any of that. Certainly, reasonable and important inquiries would have been: "Is he still in the home?" "What is he doing?" "Has he calmed down or is he still threatening people?" "What does he look like?" None of this happened.

[¶ 18.] The fact that the defendant had something in his hand and put it in his pocket is not evidence of any threat. In fact, it is evidence to the contrary. If the defendant had some dangerous weapon and intended to use it, he would not have put it in his pocket. It is also clear that he had the legal right to carry a knife in his pocket or in his hand. There is no evidence that would come within Section 3–4–98 of the Cheyenne River Sioux Tribe Law and Order Code (government exhibit 2). There was no evidence that at the time he had the knife in the street that he had any intent to unlawfully assault someone. In fact, the evidence at best would be that he had no such intent. Whatever he had in his hand, he had placed in his pocket. The court takes judicial notice of certain well-known facts. Many thousands of people in South Dakota routinely carry knives in their pockets. Every hunter of deer, antelope, pheasants, grouse, rabbits, and other wild game carries a knife. Every person going fishing carries a knife. It is frankly outrageous that a citizen in South Dakota walking down the street with a knife in his pocket can be stopped, required to raise his hands on his head, be handcuffed, searched, and then hauled away to the police station. This is not some activity that is taking place in a metropolitan area. This is rural South Dakota. Even assuming the search of defendant's person was a legal search, finding the knife provided no probable cause whatsoever to arrest the

defendant. Finding a small knife in the pocket of a South Dakotan is about as indicative of criminal activity as someone wearing a seed corn cap.

## ORDER

[¶ 19.]  Now, therefore,

[¶ 20.]  IT IS ORDERED:

(1) The defendant's motion (Doc. 33) to suppress the search of his person and the seizure of a knife as well as defendant's later statements following his illegal arrest is hereby granted.

(2) The defendant's objections (Doc. 52) should be and are hereby sustained.